**CORRECTED COPY**
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 12-20220
_____

U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,
                    Plaintiff-Appellant,

v.

HOUSTON FUNDING, LTD II, et al.,
                            Defendants-Appellees.
_____

On Appeal from the United States District Court
for the Southern District of Texas
_____

BRIEF OF THE EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION AS PLAINTIFF-APPELLANT
_____

P. DAVID LOPEZ
General Counsel

LORRAINE C. DAVIS
Acting Associate General Counsel

DANIEL T. VAIL
Acting Assistant General Counsel

SUSAN L. STARR
Attorney

EQUAL EMPLOYMENT OPPORTUNITY
            COMMISSION

Office of General Counsel
131 M Street, N.E., 5th Floor
Washington, DC  20507
(202) 663-4727
(202) 663-7090 (fax)

susan.starr@eeoc.gov

## STATEMENT REGARDING ORAL ARGUMENT

The Equal Employment Opportunity Commission respectfully requests that oral argument be granted in this case.  The district court granted summary judgment for the defendant based on its view that Title VII's prohibition on sex-based employment discrimination does not protect women from discrimination based on a specifically sex-linked characteristic – lactation.  The Commission requests oral argument to allow for a full exploration of this important legal issue.

# TABLE OF CONTENTS

Page(s)

STATEMENT REGARDING ORAL ARGUMENT ............................................. ii

TABLE OF AUTHORITIES .................................................................. v

STATEMENT OF JURISDICTION.......................................................... 1

STATEMENT OF THE ISSUES............................................................ 1

STATEMENT OF THE CASE

   1.  Nature of the Case and Course of Proceedings ......................................... 2

   2.  Statement of Facts ...................................................................... 2

   3.  District Court's Decision .............................................................. 8

STANDARD OF REVIEW ................................................................. 9

SUMMARY OF ARGUMENT ............................................................. 10

ARGUMENT

I.  TITLE VII PROHIBITS AN EMPLOYER FROM TERMINATING A
FEMALE EMPLOYEE BECAUSE SHE IS LACTATING, SINCE <u>ONLY</u>
WOMEN CAN PRODUCE AND EXPRESS BREAST MILK ............................12

   A. <u>Firing a female employee because she is lactating violates Title VII's
general prohibition on sex discrimination</u> ......................................13

   B.  <u>Firing a female employee because she is lactating also violates the PDA,
Title VII's specific statutory prohibition on discrimination based on
"pregnancy childbirth, or related medical conditions."</u>................................20

II.  THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT
BECAUSE THE EVIDENCE WOULD SUPPORT A JURY FINDING THAT
HF'S EXPLANATION FOR TERMINATING VENTERS, JOB
ABANDONMENT, WAS A PRETEXT FOR SEX DISCRIMINATION.............26

CONCLUSION ...................................................................................................... 32

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Allen v. totes/Isotoner, Corp., 915 N.E.2d 622 (Ohio 2009) ..................................22

Baker v. John Morrell Co., 382 F.3d 816 (8th Cir. 2004) ......................................17

Barrash v. Bowen, 846 F.2d 927 (4th Cir. 1988)...................................................24

Bloate v. U.S., ___ U.S. ___, 130 S. Ct. 1345 (2010)............................................13

Bond v. Sterling, Inc., 997 F. Supp. 306 (N.D. N.Y. 1998) ....................................17

Cal. Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272 (1987) ................................19

Cerrato v. Durham, 941 F. Supp. 388 (S.D.NY 1996) ........................................9, 24

Conner v. Shrader-Bridgeport Int'l, Inc., 227 F.3d 179 (4th Cir. 2000) .................17

General Electric Co. v. Gilbert, 429 U.S. 125 (1976) .................................. 12, 19-20

Harper v. Thiokol Chemical Corp., 619 F.2d 489 (5th Cir. 1980) ..........................16

Hernandez v. Aldridge, 866 F.2d 800 (5th Cir. 1989), vacated on other
    grounds, Hernandez v. Rice, 494 U.S. 1013 (1990)...........................................20

Int'l Union, United Auto. Aerospace & Agric. Implement Workers of Am. v.
    Johnson Controls, 499 U.S. 187 (1991)................................................... 15, 21-22

Jacobson v. Regent Assisted Living, Inc., No. CV-98-564-ST, 199 US. Dist.
    LEXIS 7680 (D. Or. April 9, 1999)................................................................9, 24

Langley v. State Farm Fire & Cas. Co., 644 F.2d 1124 (5th Cir. 1981) .................15

Los Angeles Dep't of Water & Power v. Manhart, 435 U.S. 702 (1978) .........14, 21

Martinez v. NBC Inc., 49 F. Supp. 2d 305 (S.D.N.Y. 1999) ........................9, 18, 20

McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) .....................................26

Minter v. Great Am. Ins. Co., 423 F.3d 460 (5th Cir. 2005)....................................9

Nashville Gas Co. v. Satty, 424 U.S. 136 (1977) ........................................14, 15, 18

Nevada Dep't of Human Res. v. Hibbs, 538, U.S. 721 (2003) ......................... 15-16

Newport News Shipbuilding & Drydock Co. v. EEOC
    462 U.S. 669 (1983)........................................................................................14, 19

Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n, 499 U.S. 117 (1991).......24

Oncale v. Sundowner Offshore Servs., Inc., 532 U.S. 75 (1998)............................18

Pacourek v. Inland Steel Co., 858 F. Supp. 1393 (N.D. Ill. 1994)....................20, 22

Phillips v. Martin Marietta Corp., 400 U.S. 542 (1971).....................................15, 16

Pond v. Braniff Airways, Inc., 500 F.2d 161 (5th Cir. 1974)...................................15

Puente v. Ridge, M-04-267, 2005 U.S. Dist. LEXIS 46624 (S.D. Tex. July 6,
    2005), aff'd on other grounds, 2009 WL 1311504 (5th Cir. May 12,
    2009). ................................................................................................... 9, 23-24

Ray v. Tandem Computers, Inc., 63 F.3d 429 (5th Cir. 1995)................................17

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000) ...................10, 29

Rutherford v. Harris County, 197 F.3d 173 (5th Cir. 1999)....................................27

Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981) .............................27

Turner v. Kan. City S. Ry. Co., 675 F.2d 887 (5th Cir. 2012) ................................27

Wallace v. Pyro Mining Co., 789 F. Supp. 867 (W.D. Ky. 1990), aff'd on
    other grounds, 951 F.2d 351 (6th Cir. 1991) ....................................... 9, 18-20, 24

Willingham v. Macon Tel. Publ'g. Co., 507 F.2d 1084 (5th Cir. 1975) ...........14, 24

STATUTES

28 U.S.C. § 1291........................................................................................................1

28 U.S.C. §§ 1331, 1343, and 1345..........................................................................1

Americans with Disability Act of 1990, 42 U.S.C. §§ 12101 et seq.................17, 24

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq...............passim

**RULES AND REGULATIONS**

Fed. R. App. P. 4(a)(1)(B) ...........................................................................................1

Fed. R. Civ. P. 56(a)................................................................................................10

**OTHER AUTHORITIES**

H.R. No. 95-948 (1978) ...........................................................................................23

S. Rep. No. 95-331, pp. 3-4 (1977)..........................................................................23

The Free Dictionary, Medical,
   http://medicaldictionary.thefreedictionary.com/lactation ....................................13, 25

World English Dictionary,
   http://www.dictionary.reference.com/browse/lactation ......................................13

World English Dictionary, www.dictionary.reference.com/browse/medical............25

## STATEMENT OF JURISDICTION

This is a government enforcement action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.  The district court had jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1345.  Final judgment was entered on February 2, 2012.  ROA 209; RE Tab 4.[1]  A timely notice of appeal was filed on March 30, 2012.  Fed. R. App. P. 4(a)(1)(B).  ROA 259, RE Tab 2.  This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Whether, as a matter of law, Title VII's prohibition on discrimination based on sex includes discrimination because of the sex-specific trait of lactation (i.e., producing and/or expressing milk) – something intrinsically female.

2.  Whether the district court erred in granting summary judgment to the defendant, where there is sufficient evidence to support a jury finding that the defendant fired the charging party because she wanted to return to work from maternity leave while she was still lactating.

_____

[1] "ROA" refers to the record on appeal.  RE refers to EEOC's record excerpts.

<u>STATEMENT OF THE CASE</u>

1.  <u>Nature of the Case and Course of Proceedings</u>

This is an appeal from a final judgment dismissing this enforcement action

brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e <u>et seq.</u>

EEOC filed its complaint in July 2011.  The complaint alleges, citing 42 U.S.C.

§§ 2000e (k) and 2000e-2(a)(1), that Houston Funding II, Ltd. and Houston

Funding Corporation ("HF") violated Title VII by subjecting charging party

Donnicia Venters to disparate treatment on the basis of her sex and/or specifically

because of "pregnancy, childbirth, or related medical conditions."  ROA 57, 59,

RE Tab 5.  HF moved for summary judgment on November 11, 2011.  ROA 3.

The district court granted its motion and dismissed the EEOC's case on February

2, 2012.   ROA 209, RE Tab 4.  This appeal followed.

2.  <u>Statement of the Facts</u>

Venters worked as an account representative/collector for HF from March

2006 until HF terminated her in February 2009.  ROA 24, RE Tab 6.  While she

worked at HF, she consistently met or exceeded her employer's expectations.

ROA 147-48.  On December 1, 2008, Venters took a maternity leave of absence.

ROA 157, Tab 7.  HF set no date for her to return to work.  <u>Id.</u>  Venters's direct

supervisor, General Floor Manager Robert Fleming, told her, "Come back when

you come back, whenever.  Your spot will be here when you come back."  <u>Id.</u>

On December 11, 2008, Venters gave birth.  ROA 162, Tab 7.  Soon after, Venters called the office and spoke with company Vice President Harry Cagle who, according to Venters, was "friendly" throughout the conversation, asking her when she was returning to work.  ROA 160, RE Tab 7.  Venters told him that she had a Cesarean section (C-section) delivery and that she would return when the doctor "releases" her.  ROA 160-61, RE Tab 7.  Venters testified that this was the first time she had spoken with Cagle since she had given birth and she "didn't think" that she mentioned anything about expressing milk during the conversation.  ROA 160, RE Tab 7.  There is no evidence that Cagle voiced any objection to her timeframe for returning.

Venters contacted members of HF management often and regularly throughout her maternity leave and management repeatedly assured her that "everything was good."  ROA 161, RE Tab 7.  Fleming testified that he spoke with Cagle about Venters's maternity leave in December and that "Cagle agreed to save a spot for Donnicia Venters."  ROA 177, RE Tab 8.  Fleming said Venters's "items at work were never moved as we expected her return."  ROA 176, RE Tab 8.  On December 20, 2008, Laura Stewart, Controller in Human Resources, e-mailed Fleming asking if Venters had quit.  ROA 179, Tab 9.  Fleming responded, "No, she is out on maternity leave.  I am unsure of the day of her return."  Id.

3

According to Fleming, "[d]uring her absence, [Venters] called [Fleming] at least once a week to check on work status or if any of her accounts yielded a commission." ROA 176, Tab 8. Fleming testified that he "shared that information with . . . Cagle during [their] weekly meetings." Id. In early January 2009, Venters called Fleming and told him she was having complications with her recovery and although she did not know when she would return, she said, "I would assume February." ROA 161, 167, RE Tab 7. Fleming told her to return to work "whenever you're ready [because] we have your spot." ROA 161, RE Tab 7. According to Venters, when she asked about the personal property she had left on her desk, he said, "Your stuff is fine on your desk." Id.

Venters then asked Fleming to ask Cagle if it would be permissible for her to express breast milk at work. Id. Fleming testified that when he "mentioned to Harry Cagle . . . about the possibility of [Venters] bringing a breast pump to work\ . . . Harry responded with a strong 'NO. Maybe she needs to stay home longer.'" ROA 177, RE Tab 8. Venters testified that she was not aware of Cagle's response. ROA 161-62, RE Tab 7. Fleming left HF on January 9, 2009. ROA 177, RE Tab 8.

In addition to Fleming's sworn statement that Venters contacted him weekly, cell phone records showed that Venters spoke to personnel at HF for a total of 115 minutes between January 7, 2009, and February 6, 2009. ROA 156-57, RE Tab 7;

4

ROA 194, 196, RE Tab 15.  Venters testified that, during that month, she spoke

with numerous HF employees, including Kenneth Randall (Team Leader),

Jonathan Williams (Team Leader), Krista Bell (Collector), and Stewart and told

them that she would return to work as soon as the doctor officially released her.

ROA 162, 167, RE Tab 7.  For example, at the end of January, Venters called

Randall and informed him that she had an infection related to childbirth, that she

hoped to return in February, and that she would keep HF updated.  ROA 170, RE

Tab 7.

Venters paid for and received insurance compensation for her absence from

the date of her C-section delivery through February 5, 2009 (i.e., for eight weeks).

ROA 156, RE Tab 7.  Venters testified that, throughout her leave, she spoke with

Stewart about her insurance and that Stewart called her repeatedly, leaving her

voicemails "to make sure [she] pa[id] her premium on the first of the month."

ROA 165-66, RE Tab 7.

On February 16, 2009, Venters's doctor told her she could go back to work.

ROA 164, RE Tab 7.  She called and left a message for Cagle that day.  ROA 163,

RE Tab 7.  Venters called Cagle again the next day.  ROA 165, RE Tab 7.  After

initial pleasantries, she told him she was ready to return to work.  Id.

Venters then told Cagle that she "was breast feeding, lactating, and [asked]

. . . would it be okay if [she] used the back room to use a breast pump?"  Id.

5

Venters testified that Cagle responded with silence.  There was a lengthy pause

which was so long Venters became unsure whether Cagle was still on the phone.

Finally, Cagle said, "Well, your spot has been filled . . . .  We thought you wasn't

[sic] returning to work."  Id.  When Venters asked Cagle why he thought that, he

replied, "We haven't heard from you."  Id.  Venters responded that "I've been

talking to Robert [Fleming] . . ." but Cagle cut her off to say that Fleming was no

longer with the company.  Id.  Venters told Cagle that she also had spoken with

Randall, Williams, and Stewart and had continued to pay her insurance premiums.

Id.

      According to Venters, Cagle then stated that his wife returned to work in six

weeks after giving birth.  Venters replied that she had had a C-section.  ROA 165-

66, RE Tab 7.  Cagle said, "We put you down for job abandonment."  ROA 166,

RE Tab 7.  Venters replied that she "can't believe" he did not know she was

returning to work in light of the detailed conversations she had had with multiple

managers, most recently with Stewart about maintaining insurance coverage until

she returned to work.  Id.  When Venters asked Cagle what her termination date

was, he said he would have to get back to her.  Id.  After a few hours, Venters

6

called back to ask again about her official termination date.  Cagle responded, " I guess [it was] the 13th."  Id.[2]

A short time later, Venters called the office again and spoke with Randall, Williams, and Stewart.  According to Venters, they all greeted her "as normal" and asked when she was coming back to work.  ROA 168-69, RE Tab 7.  For example, when Venters spoke with Williams, he immediately asked, "Hey, are you ready to come back to work?"  When she told him that "apparently I don't have a spot," he said, "What do you mean?  Yeah, your stuff is still . . . ."  ROA 169, RE Tab 7. When Venters told Williams that Cagle said she had abandoned her job, he said, "What? . . . No . . . I'll see what's going on."  Id.  And when Venters spoke with Randall, he also appeared to be unaware that she had been terminated.  Id.  No one at HF with whom Venters spoke that day – except for Cagle – stated that her spot had been filled.  Id.

On February 20, 2009, HF sent Venters through certified mail a letter dated February 16, stating that she "failed to return to work or contact [her] supervisor regarding her return" and that she was "terminated . . . due to job abandonment

---

[2] A "Joint Chronology" filed with the district court states that "HF contends" that on February 10, 2009, Cagle, Stewart, Jeffrey Moore (a Collection Manager hired on January 21, 2009), and Denise Birdsall (Legal) convened and "decided to terminate Venters's employment."  ROA 24, Tab 6.  There is no record evidence to support the assertion that this meeting took place.

effective February 13, 2009." ROA 185, 187, Tabs 11, 12. HF stated to the Texas Workforce Commission that it terminated Venters because she "did not contact the office the entire month of February so HF assumed she was not returning and filled her position," that HF "held open her position for longer than the normal 6 weeks leave," [3] and that "[h]er failure to contact the office was the reason for termination." ROA 189, Tab 13.

Venters filed an EEOC charge, alleging that she was "discriminated against because of my sex (pregnancy) in violation of Title VII." ROA 181, RE Tab 10. In its position statement, HF alleged that Venters began maternity leave "on December 1, 2008 [and] [t]hereafter . . . did not contact her supervisor regarding the date she would return to work nor did she ever attempt to return to work at [HF]." ROA 192, RE Tab 14. HF contended that it thus "concluded that Ms. Venters had abandoned her job and her employment was terminated." It stated that "[o]n February 16, 2009, HF notified Ms. Venters by certified mail." Id.

This lawsuit followed.

3. District Court's Decision

---

[3] HF informed the Texas Workforce Commission that HF's practice was to permit a "normal six weeks [of] leave." ROA 189, RE Tab 13. However, there was no evidence that this was ever communicated to Venters. HF's handbook does not contain any policy related to the amount of time allowed off for medical or pregnancy leave. ROA 168, RE Tab 7.

The district court granted defendant's motion for summary judgment and dismissed the Commission's complaint.  R209, RE Tab 4.  In a terse decision, the court ruled that EEOC failed to state a cognizable Title VII claim.  According to the court, even if EEOC could demonstrate that HF's stated reason for terminating Venters (job abandonment) was a pretext for discrimination based on lactation, HF still could not be found liable for violating Title VII because "lactation is not pregnancy, childbirth or a related medical condition." ROA 207, RE Tab 3.  The court stated that related medical conditions "may include cramping, dizziness, and nausea while pregnant."  Id. (citing Cerrato v. Durham, 941 F. Supp. 388, 393 (S.D.NY 1996)).  The court reasoned that, after the day Venters gave birth, "she was no longer pregnant and her pregnancy-related conditions ended."  Id.  The court then concluded, citing a string of district court cases, that "[f]iring someone because of lactation or breast-pumping is not sex discrimination."  Id. (citing Puente v. Ridge, M-04-267, 2005 U.S. Dist. LEXIS 46624 at *11-12 (S.D. Tex. July 6, 2005); Martinez v. NBC Inc., 49 F. Supp. 2d 305, 311 (S.D.N.Y. 1999); Jacobson v. Regent Assisted Living, Inc., No. CV-98-564-ST, 199 US. Dist. LEXIS 7680 at *29-30 (D. Or. April 9, 1999); Wallace v. Pyro Mining Co., 789 F. Supp. 867, 869 (W.D. Ky. 1990)).

## STANDARD OF REVIEW

This Court reviews a district court's award of summary judgment de novo. Minter v. Great Am. Ins. Co., 423 F.3d 460, 464-65 (5th Cir. 2005).  Summary judgment is appropriate only if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  In assessing a motion for summary judgment, the Court "must review the record taken as a whole," and "must draw all reasonable inferences in favor of the nonmoving party."  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (internal quotation marks omitted).

## SUMMARY OF ARGUMENT

Title VII prohibits discrimination "because of" an individual's sex.  At its core, this part of the statute seeks to prevent employers from denying workplace opportunities to members of one sex on the basis of characteristics unique to that sex.  Lactation is a female-specific function.  Thus, firing a female worker because she is lactating (i.e., producing and/or expressing breast milk) imposes a burden on that female worker that a comparable male employee simply could never suffer. That is the essence of sex discrimination.  The district court committed legal error in ruling otherwise.

Further, firing a woman because she is producing and/or expressing breast milk also violates the specific statutory prohibition in the Pregnancy

Discrimination Act (PDA).  The PDA amended Title VII to clarify that sex

discrimination includes, but is not limited to, discrimination based on "pregnancy,

childbirth, or related medical conditions."  When enacting the PDA, Congress

specifically stated that the statute would now "extend to the whole range" of

related "physiological occurrences peculiar to women."  Similarly, the Supreme

Court has indicated that the PDA prohibits discrimination based on uniquely

female reproductive traits – including those not specifically listed in the text – such

as the pre-pregnancy ability to <u>conceive</u> a child.  The district court thus committed

legal error in parsing the PDA in a hyper-technical manner to exclude from the

PDA's scope the substantially similar biological and physiological function unique

to women – lactation.

Further, since taking an adverse action against a female worker because she

is lactating is cognizable sex discrimination, the district court erred in granting

summary judgment to HF.  The record evidence is sufficient to create a genuine

dispute about whether HF terminated Venters because she wanted to return to work

while she was still producing and expressing milk.  A reasonable jury could find

that the reason HF gave for firing Venters – job abandonment – was false and a

pretext for sex discrimination.  The evidence demonstrates that Venters was in

constant contact with HF managers throughout her leave, and that the company had

"saved a spot" for her for whenever she would be able to return.  The fact finder

11

could reasonably conclude that it was only after Venters disclosed to a company

Vice President that she wanted to use a back room at the office to express breast

milk that HF decided to fire her.

## ARGUMENT

### I. TITLE VII PROHIBITS AN EMPLOYER FROM TERMINATING A FEMALE EMPLOYEE BECAUSE SHE IS LACTATING, SINCE ONLY WOMEN CAN PRODUCE AND EXPRESS BREAST MILK.

Section 703(a)(1) of Title VII prohibits an employer from discharging any

individual "because of such individual's sex."  42 U.S.C. § 2000e-2(a)(1).  In

1976, the Supreme Court in General Electric Co. v. Gilbert, 429 U.S. 125 (1976),

ruled that an employer's refusal to provide pregnancy-related benefits was not

discrimination on the basis of sex.  See id. at 136 (holding that "an exclusion of

pregnancy from a disability-benefits plan providing general coverage is not a

gender-based discrimination at all").  Congress swiftly responded in 1978 by

enacting the Pregnancy Discrimination Act ("PDA"), which amended Title VII

specifically to clarify that "the terms 'because of sex' or 'on the basis of sex'

include, but are not limited to, because of . . . pregnancy, childbirth, or related

medical conditions."  42 U.S.C. § 2000e(k).  The PDA further states that "women

affected by pregnancy, childbirth, or related medical conditions shall be treated the

12

same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work . . . ." Id.

The Commission alleges that HF violated Title VII when it fired Donnicia Venters because of lactation, an intrinsically female function. HF moved for summary judgment arguing that nothing in Title VII prevents HF from terminating an employee because she is lactating. Without analysis, the district court agreed and held that "[f]iring someone because of lactation or breast-pumping is not sex discrimination." This is legal error.

### A. Firing a female employee because she is lactating violates Title VII's general prohibition on sex discrimination.

Even without regard to the PDA's specific prohibition on pregnancy-related discrimination, Title VII's general prohibition on sex discrimination precludes discrimination based on any inherently sex-linked trait or function – such as lactation.[4]  Nothing in the PDA altered this fundamental Title VII principle.  The PDA clarifies the term "because of sex" by defining it as "includ[ing], but not

---

[4] It is beyond dispute that only women lactate.  See World English Dictionary, http://www.dictionary.reference.com/browse/lactation (defining lactation as (1) "the secretion of milk from the mammary glands"; (2) "the period during which milk is secreted"); The Free Dictionary, Medical, http://medical-dictionary.thefreedictionary.com/lactation (defining lactation as "the medical term for yielding of milk by the mammary glands which leads to breastfeeding").

limited to" pregnancy, childbirth, or related medical conditions. 42 U.S.C.

§2000e(k) (emphasis added); see generally, Bloate v. U.S., ___ U.S. ___, 130 S.

Ct. 1345, 1360 (2010) (when construing statutory phrase "includ[ing] but not

limited to" followed by specific examples, "it is generally improper to conclude

that entities not specifically enumerated are excluded") (internal citations omitted).

As the Supreme Court recognized, "[a]lthough the 1978 Act makes clear that this

language should be construed to prohibit discrimination against a female employee

on the basis of her own pregnancy, it did not remove or limit Title VII's

prohibition of discrimination on the basis of the sex of the employee . . . which was

already present in the Act." Newport News Shipbuilding & Drydock Co. v.

EEOC, 462 U.S. 669, 676 n.11 (1983).

Title VII precludes treating women adversely because they are women.

Before the enactment of the PDA, the Supreme Court had made clear that Title VII

bars employers from "burden[ing] female employees in such a way as to deprive

them of employment opportunities because of their different role." Nashville Gas

Co. v. Satty, 424 U.S. 136, 137 (1977) (construing analogous § 703(a)(2)); see also

Los Angeles Dep't of Water & Power v. Manhart, 435 U.S. 702, 707 (1978)

("Myths and purely habitual assumptions about a woman's inability to perform

certain kinds of work are no longer acceptable reasons for refusing to employ

qualified individuals . . . ."). As this Court has said, "We perceive the intent of

Congress [in enacting Title VII in 1964] to have been the guarantee of equal job

opportunity for males and females" and "the Act should reach any device or policy

of an employer which serves to deny . . . retention of a job . . . because an

individual is either male or female." <u>Willingham v. Macon Tel. Publ'g. Co.</u>, 507

F.2d 1084, 1091 (5th Cir. 1975). If an employer takes an adverse action that

"inheres in the nature of an employee as a man or a woman, or if the employer in

any way permits stereotypical culturally-based concepts . . . to creep into its

thinking, then Title VII" is violated. <u>Pond v. Braniff Airways, Inc.</u>, 500 F.2d 161,

165-66 (5th Cir. 1974); <u>see also</u> <u>Langley v. State Farm Fire & Cas. Co.</u>, 644 F.2d

1124, 1127 (5th Cir. 1981) (citing <u>Satty</u>, 434 U.S. at 142) (Title VII prohibits

employers from depriving women of employment opportunities "because of their

role in the scheme of existence.").

Thus, where an employer intentionally discriminates based on a sex-specific

trait or function – e.g., an attribute that <u>only</u> women or <u>only</u> men can possess – the

employer violates Title VII (absent a valid bona fide occupational qualification

("BFOQ") defense). <u>See</u> 42 U.S.C. § 703(e)(1) (allowing for affirmative defense if

sex is a BFOQ). Otherwise, the statutory prohibition would be hollow. It would

allow, for example, employers to discriminate against women workers because

they are mothers or deny women employment opportunities because they have the

potential to become pregnant. <u>See</u> <u>Phillips v. Martin Marietta Corp.</u>, 400 U.S. 542

(1971) (Title VII prohibits employment discrimination against mothers); <u>Int'l</u>
<u>Union, United Auto. Aerospace & Agric. Implement Workers of Am. v. Johnson</u>
<u>Controls</u>, 499 U.S. 187, 211 (1991) (explaining that "[c]oncern for a woman's
existing or potential offspring historically has been the excuse for denying women
equal employment opportunities" and ruling that precluding fertile women from
particular jobs is blatant sex discrimination in violation of Title VII); cf. <u>Nev.</u>
<u>Dep't of Human Res. v. Hibbs</u>, 538 U.S. 721, 736-737 (2003) (explaining that sex
discrimination "is rooted, primarily, in stereotypes about women when they are
mothers or mothers-to-be" (internal quotation marks omitted)).  Further, the broad
statutory prohibition on sex discrimination applies even where the discrimination
adversely affects only a portion of the protected class.  <u>See</u> <u>Martin Marietta</u>, 400
U.S. at 544 (embracing idea that disparate treatment which disadvantages some but
not most women constitutes a Title VII violation.

   This Court relied on these principles in a case applying pre-PDA law to hold
that discrimination based on a woman's menstrual cycle, a uniquely female
characteristic, violates Title VII.  In <u>Harper v. Thiokol Chemical Corp.</u>, 619 F.2d
489, 491-92 (5th Cir. 1980), a case brought under § 703(a)(2) of Title VII, this
Court held that an employer's policy of requiring women who had been on
pregnancy leave to have sustained a normal menstrual cycle before returning to
work "clearly deprives female employees of employment opportunities and

imposes on them a burden which male employees need not suffer," and, as such,

violated Title VII.  In so ruling, this Court never questioned that discrimination

based on such a sex-specific trait was discrimination because of the female

employee's sex. [5]

Accordingly, terminating a woman because she is lactating is inevitably

discrimination on the basis of sex.  To fire an employee because she is producing

or needs to express breast milk is to punish her for a normal bodily function that is

singularly female.  Cf. Bond v. Sterling, Inc., 997 F. Supp. 306, 311 (N.D. N.Y.

1998) ("It is simply preposterous to contend a woman's body is functioning

abnormally because she is lactating") (Americans with Disability Act of 1990, 42

U.S.C. §§ 12101 et seq. ("ADA") claim rejecting breast-feeding as a disability).

---

[5] Similarly, this Court and other courts have readily concluded that harassment consisting of female-specific anatomical epithets, or because of biological processes that are peculiarly female, obviously is sex-based.  See e.g., Baker v. John Morrell  Co., 382 F.3d 816, 821 (8th Cir. 2004) (mocking of female employee on sex-specific bases such as menstruation and hysterectomy constituted "blatant sexual harassment"); Conner v. Shrader-Bridgeport Int'l, Inc., 227 F.3d 179, 188-89 (4th Cir. 2000) (sex-based harassment included repeatedly asking if plaintiff was "on the rag" and making "similar derogatory remarks"); Ray v. Tandem Computers, Inc., 63 F.3d 429, 434 (5th Cir. 1995) (noting that repeated use of the word "c**t" – a "crude and contumelious appellation" describing female anatomy – would raise an inference of discriminatory animus against women on the basis of sex).

Terminating because a woman is lactating therefore deprives her of employment opportunities and constitutes discrimination against her because she is a member of the female sex.  See 42 U.S.C. §2000e-2(a)(1).

Here, a reasonable jury could find that HF imposed on Venters a substantial burden that men could not and would not suffer – i.e., having to refrain from producing or expressing breast milk to keep a job.  Cf. Satty, 434 U.S. at 142 (disapproving of practices that "impose[] on women a substantial burden that men need not suffer").  A reasonable jury thus also could find that HF violated Title VII.  Cf. Oncale v. Sundowner Offshore Servs., Inc., 532 U.S. 75, 80 (1998) (Title VII's text makes clear that the "critical issue" in analyzing discrimination cases is whether "members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are [or would or could not be] exposed.") (internal citation omitted).

In ruling otherwise, the district court made the general statement that terminating a woman because of lactation is not sex discrimination.  The district court cited various district court cases in support.  See, e.g., Martinez v. NBC, Inc., 49 F. Supp. 2d 305, 309-10 (S.D.N.Y. 1999); Wallace v. Pyro Min. Co., 789 F. Supp. 867, 869 (W.D. Ky. 1990), aff'd on other grounds, 951 F.2d 351 (6th Cir. 1991).  However, these cases rest on dubious grounds.  Martinez and Wallace hold, citing the Supreme Court's decision in Gilbert for support, that the "drawing of

18

distinctions among persons of one gender on the basis of criteria that are immaterial to the other, while in given cases perhaps deplorable, is not the sort of behavior covered by Title VII." Martinez, 49 F. Supp. 2d. at 310; see also Wallace, 789 F. Supp. at 869 ("While breast-feeding, like pregnancy, is a uniquely female attribute, excluding breast-feeding from those circumstances for which [the employer] will grant personal leave is not impermissible gender-based discrimination, under the principles set forth in Gilbert.").

This reasoning is fatally infirm. In enacting the PDA, Congress roundly rejected both the holding and analysis in Gilbert. See Cal. Fed. Sav. & Loan Ass'n v. Guerra, 479 U.S. 272, 284–285 (1987) (explaining that "the PDA reflects Congress' disapproval of the reasoning in Gilbert"); Newport News, 462 U.S. at 678 (Congress "unambiguously expressed its disapproval of both the holding and reasoning" of Gilbert). Indeed, Congress instead explicitly endorsed the reasoning of the dissenters in Gilbert, who readily recognized that Title VII prohibits discrimination based on attributes specific to one sex. See Newport News, 462 U.S. at 678; Guerra, 479 U.S. at 277 n.6; see also Gilbert, 429 U.S. at 149 ("Surely it offends common sense to suggest . . . that a classification revolving around pregnancy is not, at the minimum, strongly 'sex related.'") (Brennan, J., dissenting); id. at 162 (explaining that discrimination on the basis of pregnancy "by definition" is discrimination on the basis of sex, "for it is the capacity to become

19

pregnant which primarily differentiates the male from the female") (Stevens, J., dissenting).

Moreover, it defies logic to reason, as <u>Martinez</u> and <u>Wallace</u> did, that taking adverse action on the basis of a unique sex-linked trait cannot be discrimination on the basis of sex simply because the opposite sex could never possess such a trait. Precisely the opposite is true. Where the employer denies employment opportunities on grounds which <u>only</u> disadvantage one sex, it has violated Title VII's general prohibition on sex-based discrimination.

B. <u>Firing a female employee because she is lactating also violates the PDA, Title VII's specific statutory prohibition on discrimination based on "pregnancy childbirth, or related medical conditions."</u>

Discrimination based on lactation violates Title VII without resort to the precise language of the PDA. Nonetheless, lactation discrimination also is barred by the PDA's text. It is discrimination because of "pregnancy, childbirth, or related medical conditions." 42 U.S.C. § 2000e(k).

The handful of courts to have addressed this issue (mostly in unpublished decisions from district courts) have, like the district court here, read the PDA far too restrictively. In passing the PDA, Congress (responding to <u>Gilbert</u>) clarified that "classifications based on pregnancy and related medical conditions are never gender neutral." <u>Pacourek v. Inland Steel Co.</u>, 858 F. Supp. 1393, 1401 (N.D. Ill. 1994). Consequently, in light of the PDA, discrimination "because of sex" clearly

includes (but is not limited to) adverse actions taken based on reproductive-related conditions peculiar to women.

The phrase "pregnancy, childbirth, or related medical conditions" should be construed expansively. See Hernandez v. Aldridge, 866 F.2d 800, 803 (5th Cir. 1989), vacated on other grounds, Hernandez v. Rice, 494 U.S. 1013 (1990) (explaining that Title VII is a remedial statute to be liberally construed in favor of the victims of discrimination) (internal citations and quotation marks omitted)). It should be read to protect women from discrimination based on the range of functions or traits related to their reproductive biology or physiology. Cf. Manhart, 435 U.S. at 708 n.13 ("In forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes.") (internal quotation marks omitted). The PDA should not be parsed to preclude substantially similar biological or physiological traits or functions unique to women simply because they are not explicitly enumerated.

This sort of hyper-literal approach to interpreting the PDA has already been implicitly rejected by the Supreme Court. In Johnson Controls, the Court found that classifying female employees because of "gender and their childbearing capacity," regardless of whether they were, in fact, pregnant, is sex-based discrimination in violation of the PDA. 499 U.S. at 197-98 (emphasis added); id.

21

at 207 (stating that Title VII "prohibit[s] [] employer[s] from discriminating against a woman because of her capacity to become pregnant"). The Court held as much, even though Congress did not put the phrase "capacity to <u>become</u> pregnant" into the PDA.

Similarly, while the word "lactation" does not explicitly appear in the statute, this biological and physiological function logically falls within the broad sweep of the statutory phrase "pregnancy, childbirth, or related medical conditions." Pregnancy and childbirth, and the biological and physiological changes in a woman's body that result from pregnancy and childbirth, immediately precede and cause lactation. Producing and/or expressing breast milk is inextricably intertwined with the childbearing process. Discrimination against a woman because she is lactating thus is inevitably discrimination based on "pregnancy, childbirth, or related medical conditions."

Justice Maureen O'Connor of the Ohio Supreme Court came to this conclusion to determine whether lactation was covered under an analogous state statute with language substantially similar to the PDA. Characterizing the language of the PDA as "broad," Justice O'Connor stated that, "[g]iven the physiological aspects of lactation, I have little trouble concluding that lactation also has a clear, undeniable nexus with pregnancy and with childbirth. Therefore, it necessarily follows that lactation is 'because of or on the basis of pregnancy' and

that women who are lactating are women 'affected by pregnancy [or] childbirth.'"

Allen v. totes/Isotoner, Corp., 915 N.E.2d 622, 630 (Ohio 2009) (O'Connor, J.,

concurring in judgment only) (citing, Pacourek, 858 F. Supp. at 1402) (quoting

House Report (1978), No. 95–948, 95th Congress, 2d Session 5)).

The legislative history of the PDA also supports this reading. The Senate

Report, for example, stated that the PDA "defines sex discrimination, as proscribed

in the existing statute, to include these physiological occurrences [pregnancy,

childbirth, and related medical conditions] peculiar to women[.]" S. Rep. No. 95-

331, pp. 3-4 (1977) (emphasis added). And, in defining the "Basic Principles" of

the PDA, the House Report states that, "In using the broad phrase 'women affected

by pregnancy, childbirth and related medical conditions,' the bill makes clear that

its protection extends to the whole range of matters concerning the childbearing

process." H.R. No. 95-948, p. 5 (1978) (emphasis added). This legislative history

should foreclose the district court's crabbed reading of the PDA's text.

The district court offered scant support for its conclusion that lactation is

"not related to pregnancy or childbirth." For instance, it cited a lower court

decision in Puente v. Ridge. See R.21 at 3 (citing, 2005 WL 1653017, at *4 (S.D.

Tex. July 6, 2005)) (holding that "breast-feeding is not a condition within the scope

of the PDA"). However, on appeal, in an unpublished decision, this Court

affirmed on different grounds. Notably, it "[a]ssum[ed] without deciding" that the

23

plaintiff who was lactating "would fall within the class of persons" protected by

the PDA.  Puente v. Ridge, 2009 WL 1311504 at *4 (5th Cir. May 12, 2009).  This

Court thus has declined to endorse the peculiar notion that lactation discrimination

is not cognizable under the PDA. [6]  The district court's reliance here on the lower

court's ruling in Puente was misplaced.

Further, the district court here opined that "related medical conditions" in

the PDA are limited to disabling conditions such as "cramping, dizziness, and

nausea."  But for support, the district court cited a case under the ADA with no

Title VII analysis.  See Cerrato, 941 F. Supp. at 393 ("Rather, this case concerns

only whether pregnancy-related conditions including spotting, leaking, cramping,

dizziness, and nausea can qualify as disabilities under the ADA . . . .").  And the

court below cited Jacobson v. Regent Assisted Living, Inc., 1999 Lexis 7680 at

*29-30.  That decision, however, concludes, without analysis or support, that

"Title VII and the PDA do not cover breast feeding or childrearing concerns

─────────────────────

[6] The other federal appellate decisions involving lactation similarly did not discuss
in any detail why lactation should fall outside the statutory phrase "pregnancy,
childbirth, or related medical conditions."  See Wallace v. Pyro Mining Co., 951
F.2d 351 (6th Cir. 1991) (plaintiff "failed to produce evidence supporting her
contention that breastfeeding was a medical necessity" and thus could not make
out a violation of the terms of the PDA); Barrash v. Bowen, 846 F.2d 927, 930 (4th
Cir. 1988) (employer who was required to provide sick leave only for
incapacitating illnesses did not violate the PDA by refusing to provide sick leave
for breast-feeding where breast-feeding was not incapacitating).

because they are not 'medical conditions related to pregnancy, childbirth or related medical conditions.'"   Id.

To the extent the district court believed that all pregnancy-related processes like lactation should be shoe-horned into a statutory subcategory (i.e., into "pregnancy" or "childbirth" or "related medical conditions"), it misread the PDA. But in any event, lactation fits comfortably within any common-sense understanding of the phrase "related medical conditions."  This particular concept is not defined anywhere in the statute, but principles of statutory construction provide guidance.  "When a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration."  Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n, 499 U.S. 117, 129 (1991).  "Medical is a general term related to the science of medicine." See World English Dictionary, www.dictionary.reference.com/browse/medical (defining medical as (1) "of or relating to the science of medicine or to the treatment of patients by drugs, etc., as opposed to surgery"; (2) "a less common word for medicinal").  Moreover, lactation is the medical term for yielding milk by the mammary glands which leads to breastfeeding.  See The Free Dictionary, Medical, http://medical-dictionary.thefreedictionary.com/lactation. Therefore, the phrase "related medical conditions" in the PDA should be construed to include all pregnancy- or childbirth-connected conditions related to the science of medicine.

And because the yielding of milk by mammary glands is a medical condition caused by pregnancy and childbirth, lactation certainly qualifies as a "related medical condition" for purposes of the PDA.

In sum, Title VII's terms, both its general prohibition against sex discrimination and the PDA's specific prohibition against discrimination on the basis of "pregnancy, childbirth, or related medical conditions," bars employers from depriving women employment opportunities because they are lactating.  The district court committed legal error in ruling otherwise.

## II.  THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT BECAUSE THE EVIDENCE WOULD SUPPORT A JURY FINDING THAT HF'S EXPLANATION FOR TERMINATING VENTERS, JOB ABANDONMENT, WAS A PRETEXT FOR SEX DISCRIMINATION.

The district court's decision, like HF's motion for summary judgment, is based on the narrow grounds that terminating an employee because she is lactating is not discrimination because of sex.  R.21 at 3 (ruling that "even if Venters'[s] claims are true, the law does not punish lactation discrimination").  As set forth above, that is legal error.  Further, on this record, there is sufficient evidence to create a genuine dispute about whether HF in fact fired Venters because she wanted to return to work while she was still producing and expressing breast milk. Summary judgment thus should be reversed.

26

The Commission can prove its claim of sex-based discrimination by using the circumstantial evidence framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); see also Puente, 2009 WL 1311504 at **3 (applying McDonnell Douglas framework in Title VII case involving the PDA).   At summary judgment, this framework first requires the plaintiff to point to evidence creating a genuine dispute as to whether it could prove a prima facie case – a burden that "is not onerous."  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).  If the plaintiff meets this burden, the defendant must proffer a legitimate, non-discriminatory explanation for its actions. If the defendant does, the plaintiff must create a jury question as to whether the purported justification is a pretext for discrimination.  See Turner v. Kan. City S. Ry. Co., 675 F.2d 887, 892 (5th Cir. 2012).

HF's argument below was limited to challenging whether firing an employee because she is lactating is sex-based discrimination.  It did not question whether the EEOC had created a prima facie case.  Nor could it have.

To make out a prima facie case, the plaintiff has to show that (1) the victim was a member of a protected class; (2) the victim was qualified for the position at issue; (3) the victim suffered an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of unlawful discrimination.  See Rutherford v. Harris County, 197 F.3d 173, 179 (5th Cir.

1999).  The record evidence here creates at least a genuine dispute as to each of
these elements.  Venters was a female (and thus a member of a protected class).
She was obviously qualified for her account representative/collector position, as
she had been performing it adequately (and, by some accounts, very successfully),
for several years.  She was terminated (clearly an adverse employment action).
And a reasonable jury could find that Vice President Cagle was not comfortable
with allowing Venters to return to work while she was still producing and
expressing milk – facts that allow the inference that Cagle fired her because she
was lactating.

HF has proffered an ostensibly legitimate, non-discriminatory reason for its
decision to fire Venters – i.e., that Venters "abandoned" her job.  However, the
record reveals abundant evidence suggesting that this explanation is a pretext for
unlawful sex discrimination.   A reasonable jury could conclude that HF's
justification was not credible, and that HF actually terminated Venters because she
was lactating.

A reasonable jury could find that while Venters was out on leave, her
supervisor asked Cagle if she could express milk when she returned to work.
Cagle responded with a resounding "No" and declared that "Maybe she needs to
stay home longer."  A jury also could reasonably conclude that Cagle was
consistently pleasant with Venters while she was out on maternity leave, and that it

was only after Venters was released to return to work and promptly asked Cagle if there was a space in the workplace where she could express breast milk that Cagle decided to fire her. In fact, after Venters made this request, Cagle paused for so long that Venters had to verify whether he was still on the phone. His first words after Venters asked if she could lactate at work were, "your spot has been filled." This evidence would allow a reasonable fact finder to find that Cagle fired Venters because she was wanted to return to work while she still was producing and expressing breast milk.

In addition to this affirmative evidence of sex discrimination, there is substantial record proof from which a reasonable jury could find that HF's justification for terminating Venters – job abandonment – was false, thereby permitting the jury also to find that HF violated Title VII. See Reeves, 530 U.S. at 147 ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover a discriminatory purpose.") HF told the Texas Workforce Commission that it only permitted employees to take six weeks of maternity leave. But it is undisputed that no one at HF had ever told Venters about any such policy. And no one at HF ever expressed any concern about the length of time she had been absent, even after Venters informed HF that she would need to be out longer than anticipated due to complications related to her C-Section delivery. To the contrary, HF officials

29

repeatedly assured her that she should take whatever time she needed, that her personal belongings could be left on her desk, and that she should come back "whenever" she could come back. Fleming, her supervisor, even told her, "Your spot will be here when you come back." Cagle likewise had "agreed to save a spot" for her. None of the persons with whom Venters had contact while she was out on leave ever hinted that her job was in jeopardy in any way.

HF alleged that it fired Venters in part because she failed to keep her supervisor informed as to when she would be able to return to work. But a jury could reasonably conclude that this, too, is unworthy of credence. During her absence, Venters stayed in constant contact with her supervisor, the HR representative, two other managers, and one co-worker. Fleming testified that he was in contact with Venters weekly, and that he told Cagle so. Venters told Fleming at the beginning of January, and Randall (a Team Leader) at the end of January, that she was unsure when she would return because she was having complications with her recovery, but that she thought it would be in February. She called Stewart (a Controller in Human Resources) repeatedly throughout the time she was on leave about her insurance. And according to cell phone records, between January 7 and February 6, Venters spoke with various employees at the office for 115 minutes.

HF also has alleged that it fired Venters because she failed to contact anyone at HF for "the entire month of February." But Cagle told Venters that her official termination date was February 13 – less than half-way through the month of February. Further, the cell phone records demonstrate that she had been in touch with HF through at least February 6 (only a week before her alleged official termination date).

In addition, HF is apparently confused as to when it actually terminated Venters. When Venters asked Cagle what her official termination date was, he could not answer the question. Cagle first told her on February 17 that she was fired. But none of the other HF employees (including management employees) with whom Venters spoke that day had any idea she had been terminated. Cagle later said her official termination date was February 13. The letter HF sent to Venters notifying her that she had been terminated is dated February 16 (though it does reference a February 13 date). And the letter was not mailed until February 20 – three days after the conversation in which Venters asked Cagle directly if she could express milk upon returning to work.

From this evidence, a reasonable jury could find that Venters had been in constant contact with HF's managers throughout her leave until the day she was told she had been fired. The jury thus also could reasonably conclude that HF's explanation for terminating her – that she had "abandoned" her job – were simply

31

not true.  On this record, the fact finder could find that instead, Cagle really

discharged Venters because he did not want her to return to work while she was

still producing and expressing milk.

Accordingly, the district court committed reversible error in granting HF's

motion for summary judgment.

## CONCLUSION

For the foregoing reasons, the ruling below should be reversed, and this case

should be remanded for trial.

Respectfully submitted,

P. DAVID LOPEZ
General Counsel

LORRAINE C. DAVIS
Acting Associate General Counsel

DANIEL T. VAIL
Acting Assistant General Counsel


/s/ Susan L.P. Starr_____
SUSAN L.P. STARR
Attorney
EQUAL EMPLOYMENT OPPORTUNITY
  COMMISSION
Office of General Counsel
131 M Street, N.E., 5th Floor
Washington, D.C. 20507
(202) 663-4727
susan.starr@eeoc.gov

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation set forth in the Federal

Rules of Appellate Procedure 29(d) and 32(a)(7)(B) and Fifth Circuit Rule 32.

This brief contains 7,021 words, from the Statement of Jurisdiction through the

Conclusion, as determined by the Microsoft Word 2007 word processing program,

with 14-point proportionally spaced type for text and 14-point proportionally

spaced type for footnotes.

　/s/ Susan L.P. Starr　　　　　
Attorney for Equal Employment
Opportunity Commission

Dated:　June 12, 2012

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2012, the foregoing opening brief of the

EEOC as appellant was electronically served on the counsel listed below via the

Court's  CM/ECF Notice of Activity system at their electronic addresses of record:

 Attorney for Defendant-Appellee:

Mark Joseph Oberti

OBERTI SULLIVAN, LLP
Suite 340
734 Main Street
Houston, TX  77002

/s/ Susan L.P. Starr

Susan L.P. Starr, Esq.